THE PEOPLE OF THE STATE OF NEW YORK, on the Complaint of DOMINICK FALZIA and Others, Complainants, *v.* ROY MEYER, EDWARD MEYER and HELEN MEYER, Defendants.

City Magistrates' Court of New York, Borough of Manhattan, Fourth District, April 18, 1938.

288

*Elias Lieberman* and *Elias Gartman* for the complainants.

*Henry Mayer* for the defendants.

*Thomas E. Dewey, District Attorney,* and *Stanley H. Fuld, Assistant District Attorney,* for the People of the State of New York.

COOPER, C. M.   From the testimony adduced before me, I must decide whether or not the defendants should be held for trial for a violation of the " kick-back " statute (Penal Law, § 962).

The complaining witnesses were employees of Wycombe, Meyer, Inc., and were members of a local of the upholsterers' union.   In September, 1937, the company and the local entered into an agreement specifying the amount of wages to be paid by the corporation to its employees.   The corporation is managed by the defendant Edward Meyer, an official and controlling stockholder, and by his son and daughter, the defendants Roy Meyer and Helen Meyer.

In November, 1937, there was a strike and all the workers were called out.   Shortly thereafter, at the home of Edward Meyer and at his suggestion, a conference was held and an arrangement arrived at whereby the majority of the corporation's employees, the complaining witnesses in this proceeding, would ostensibly receive time and a half for overtime, which was the rate specified in the union agreement and the rate previously paid, whereas they would be paid actually not at time and a half rates but on a straight time basis.   Work was resumed, and one of the complaining witnesses, Dominick Falzia, assisted the defendants in the execution of this

plan for a period of four weeks, commencing about the latter part of November, 1937.

The method employed in executing this arrangement during that period was substantially as follows: The regular salaries were paid by check and the overtime in cash. Each week the defendant Helen Meyer gave Falzia a list (one such list was marked in evidence, People's Exhibit 2) containing nine columns of figures opposite the names of all those employed by the company. The first column of figures represented the overtime work of each employee; the second column, the wages per hour (not at overtime rates); the third, marked with red pencil, the amount the employee was to retain for overtime work out of the cash in his pay envelope; the fourth, the amount to which each employee was entitled for overtime work computed on a straight time basis; the fifth column set out the amount to be added to the figures in the fourth column in order to arrive at the total wages due for all overtime work at overtime rates; the sixth represented the total amount of cash in the pay envelope for overtime without deducting for " social security;" the seventh column set forth the amount which had been deducted therefor; the eighth, the only other column written in red, set forth the amount of money each worker was to return; while the ninth and last column represented the amount each employee was entitled to receive at overtime rates for overtime work minus " social security." Typical of this scheme are the figures opposite the name " Arbia," one of the employees (as they appear on People's Exhibit 2):

Arbia  9½  @99  9.30  9.40 + 4.70  14.10 — 14  4.66  13.96

Those few workers who it was thought could not be counted in on this scheme received full overtime pay, a red mark being placed opposite their names on the sheets above referred to, and Falzia was instructed not to, and did not receive back from them any money. From all the other employees Falzia each week collected the " kick-back " which he turned over to the defendant Helen Meyer.

Towards the latter part of December, 1937, the company informed some of its employees that it could not meet competitive conditions and continue operations on the same scale unless the employees would accept a twelve and one-half per cent reduction of their regular wages which had theretofore been paid according to the terms of the union agreement. After conferences this arrangement was also consummated and immediately after January 1, 1938, the complaining witnesses were paid their regular wages in cash, though the practice prior thereto had been to pay them by check,

and in each instance they received pay envelopes which indicated the union scale but which actually contained twelve and one-half per cent less than that sum. This practice continued until the week ending February twenty-first. A few days thereafter difficulties arose between the company and the union resulting in a strike which it is indicated continues up to the present time.

Counsel for the complaining witnesses strenuously argues that the employees submitted to these plans under conditions tantamount to threat, coercion and duress. While it does not lessen the offense, if any was committed, fairness dictates the conclusion that, based on the evidence before me, it was rather the financial and business difficulties which the employer was experiencing at the time which led to the formation of such a plan. On the one hand, the employer found it could not pay the wages at the rates in the union contract, while on the other hand the employees did not want to be " laid off " or their working hours curtailed. Indicating the situation as it existed then is the testimony before me of one of the complaining witnesses: " Q. From what he [the defendant Edward Meyer] told you at the time, did you understand that he was being pressed in a business way, financially — that business was bad? A. Yes. Q. And he felt the need of some sort of new set-up in order to continue in business? A. That is right."

The evidence before me demonstrates that without any notice to the union the substantial terms of the union contract were violated by the corporation in the fashion already described. This was discovered by the union after the periods of overtime and regular " kick-back," already referred to, were over. No better, however, was the behavior of the complaining witnesses in this regard. This can best be gleaned from the testimony of one of them: " Q. You knew that the union would object to what you were doing, did you not? A. Yes. Q. And was that one of the reasons why you did not reveal it to the union? A. Yes, sir. Q. You did not want to be expelled as a member? A. I did not. I wanted my job with Mr. Meyer. Q. And you knew that if you were expelled from the union, you could not keep your job, is not that right? A. I was not worrying about the union as much as I was worrying about my job with Mr. Meyer, if I opened my mouth. Q. You were not worried about the union at all at the time? A. I was worrying about myself."

Despite the financial embarrassment which prompted the employer to propound such a scheme; regardless of the willingness on the part of the employees to help consummate it, and aside from the breach of the union contract governing them, undisclosed to the union by both employer and employee, I rule that the so-called

" kick-back " statute has been violated. That section (Penal Law, § 962) provides: " Whenever an agreement for the performance of personal services requires that workmen engaged in its performance shall be paid the prevailing rate of wages, it shall be unlawful for any person, either for himself, or any other person, to request, demand, or receive, * * * that such workman pay back, return, donate, contribute or give any part or all of said workman's wages, salary, * * * to any person, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent such workmen from procuring or retaining employment, and any person who directly or indirectly aids, requests or authorizes any other person to violate any of the provisions of this section shall be guilty of a violation of the provisions of this section."

It is urged that proof of " prevailing rate of wages " is not indispensable to the establishment of a case under this section; that proof of the " kick-back " is sufficient. The law is otherwise. While the evidence adduced before me on this important part of the section is not strong, I feel that the complainants should be afforded an opportunity on the trial to substantiate it. In my opinion more must be established than that the union agreement specifies a particular rate. In other words, proof must be presented that the wages referred to represent the prevailing rate of wages. On the contrary, it is not essential in order to successfully enforce the statute that the agreement in question recite that the wages to be paid constitute the prevailing rate. (*People* v. *Schuddekoff*, 250 App. Div. 754.)

Counsel for the defendants argues that the testimony relating to the withdrawal by the defendants of twelve and one-half per cent from the wages of the employees as described above does not constitute a " kick-back " because such moneys never having been in the possession of the complaining witnesses (it was actually taken out before their pay envelopes were turned over to them), they did not " pay back, return, donate, contribute or give any part or all " of their wages as expressed in the statute. This I regard untenable, for as long as in essence the employee is deprived by the employer of a part of the prevailing wage agreed upon, irrespective of the *modus operandi* employed to effectuate such a result, the prohibition of the statute has been disregarded.

Counsel for the defendants emphasizes that if his clients have violated the law in this particular, the conduct with respect thereto of the complaining witnesses is equally reprehensible; that the latter agreed to " kick-back " part of their earnings and in that way aided and abetted the defendants in the violation of the

statute. To this I cannot subscribe. The consent of the employees to the return of part of their wages does not stamp them as accomplices of the demanding employer. In a sense, whenever there is a " kick-back," there is a consent, but in all such cases the consent is induced by a fear that work will cease if the money is not paid. That being so, one who merely consents to the arrangement thus compelled cannot be regarded as an accomplice. To hold otherwise would nullify the entire provision.

An employee, however, may occupy a dual position. Under some circumstances he may be both victim and accomplice. If in addition to returning a portion of his own wages, he assists the employer in procuring " kick-backs " from his coworkers, to the extent that he is aiding and abetting the commission of the crime, he is an accomplice whose infractions are covered by the latter part of the same section which reads: "And any person who directly or indirectly aids, requests or authorizes any other person to violate any of the provisions of this section shall be guilty of a violation of the provisions of this section."

It seems to me that the complaining witness Falzia falls within that category. We have it from his own lips that for four weeks " I went around at night after I had received that slip and collected from every individual whose name appeared on there," and " Q. Did you know you were doing something wrong at the time? A. I certainly did. Q. Did you know that you were helping Wycombe, Meyer, Inc. to violate the law? A. I knew that."

Another complaining witness, Decresenzo, testified before me: " Q. Who approached you? A. Dominick Falzia. Q. What did he say to you? A. Well, if you want the correct words, he said ' Get it up.' * * * he came along and he just walked along and collected from each man. I saw him collecting from other fellows. He stopped by my bench and got what was coming from me."

On all the proceedings had before me, I direct that Edward Meyer, Roy Meyer, Helen Meyer and Dominick Falzia stand trial for a violation of section 962 of the Penal Law.